## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DAVID C. BROOK and DANNY E. MURRAY, | § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION NO. 4:09-CV-02418 |
| EQUILON ENTERPRISES LLC d/b/a SHELL OIL PRODUCTS US, | § § § | |
| *Defendant.* | § | |

## MEMORANDUM AND ORDER

This employment discrimination, harassment, and Family and Medical Leave Act (FMLA) case is before the court on defendant Equilon Enterprises LLC d/b/a Shell Oil Products US's (Shell) motion for summary judgment.[1] The motion is granted in part and denied in part.

## Background[2]

In a nutshell, plaintiffs' theory of the case is that Shell—through its African American managers Randy Warner and Eli Finister—systematically terminated and replaced Caucasian supervisors and managers with their African American counterparts. As a part of this theory, plaintiffs David C. Brook and Danny E. Murray (both Caucasian) allege that Warner used his new policy of holding blending supervisors accountable for their subordinates to discredit and ultimately terminate them. Plaintiffs argue this policy was not applied to African American employees, including blending supervisor Clifton Guidry.

---

[1]Dkt. 18.

[2]The following facts are assumed as true for purposes of this motion only. The court will draw, as it must, all inferences arising from the facts in the light most favorable to the nonmoving party. *Hotard v. State Farm Fire & Cas. Co.*, 286 F.3d 814, 817 (5th Cir. 2002).

1

*Shell's Houston Lube Plant Blending Department*

Plaintiffs complain of discrimination and harassment while working in the blending department at Shell's Houston Lube Plant (HLP). The blending department mixes various oils, additives, and other ingredients according to specific formulas.[3] The blending process has been analogized to baking a cake; the correct "ingredients" must be used,[4] and the tank temperatures must be monitored.[5] If tank temperatures exceed the acceptable range, certain additives may burn, releasing toxic gasses.[6]

The summary judgment evidence indicates that there are two general classifications of employees in the blending department—blend supervisors and operators (also called "blenders"). Brook was a blend supervisor.[7] Murray was a night plant supervisor, and thus responsible for the blending department while on duty.[8] After Warner was hired as assistant plant manager, both blend supervisors and operators were responsible for monitoring tank temperatures.[9] Warner required blend supervisors to create a log book to record tank temperatures.[10]

---

[3]Brook Dep. 45:2–18. (Dkt. 18-15; 22-12; 26; 27-5). For ease of citation, references to depositions and affidavits will be cited as [Witness] [Dep. or Aff.] [page]:[line(s)]–[page]:[line], and will reference the docket number in the first citation to the source.

[4]Brook Dep. 45:2–9.

[5]Dkt. 18-6; Brook Dep. 50:14–16, 75:5–8.

[6]Brook Dep. 50:14–51:3.

[7]Brook Dep. 29:22–24,31:5–6.

[8]Murray Dep. 29:24–31:12. (Dkt. 18-16; 22-1; 26; 27-6).

[9]Dkt. 18-6; Brook Dep. 50:14–16, 75:5–8.

[10]Brook Dep. 53:21–54:13.

***Brook and Murray's Progressive Discipline and Termination***

Shell follows a progressive discipline regimen before termination. The progression is generally: verbal warning, written reminder, decision making leave (DML), and then termination.[11] The disciplinary steps are documented in internal memoranda. In this case, plaintiffs were issued "performance improvement plans" before their DMLs. Their disciplinary history is set forth below.

Brook's Written Reminder

In September of 2006, an incident arose where Brook's lead operator started a blend with the wrong ingredient.[12] Without seeking authorization from the lab manager or the quality group, Brook ordered the operator to start using the correct ingredient in the blend.[13] Because the wrong ingredient was originally used, the blend sat in the tank for four months.[14] After this incident on September 19, 2006, Warner issued Brook a "written reminder," outlining his failure to follow blending procedures.[15]

To show that Warner inconsistently applied his policy of holding supervisors responsible for operators' mistakes, Brook recounts an incident where Clifton Guidry, an African American

---

[11]Brook Dep 42:19–43:2.

[12]Brook Dep. 44:12–45:1; Dkt. 18-3.

[13]Brook Dep. 45:22–46:13; Dkt. 18-3.

[14]Brook Dep. 48:2–7. The disciplinary memorandum issued to Brook stated that this mistake cost Shell $100,000. (Dkt. 18-3). In his deposition, Brook stated he had no reason to dispute that figure. Brook Dep. 48:14–19. Brook's affidavit however, "supplements" his deposition testimony in stating that the actual loss to Shell was $0 because the customer ultimately accepted the slightly altered formulation. Brook Aff. 5:108–6:111. (Dkt. 22-9). Shell's reply brief argues that Brook's affidavit contradicts (rather than supplements) his deposition testimony and should thus be struck from the summary judgment evidence. This objection need not be ruled on, as the amount of loss is inconsequential to the merits of Shell's summary judgment motion.

[15]Dkt. 18-3. Brook's lead operator was similarly disciplined. Brook Dep. 49:16–50:6.

blending supervisor, was not disciplined when his operator Bobby Essett (also African American) reversed two primary element ratios.[16] Because of this mistake, a 30,000 gallon correction had to be made to the blend.[17]

Moroever, Brook points to an instance where Warner instructed the operators to change the formula in a blend to make a correction.[18] According to Brook, Warner did not have authority to make this change, and finds it inconsistent that he was not disciplined accordingly.[19]

<u>Murray's Written Reminder</u>

On November 4, 2006, a blend operator noticed a burnt smell while adding a component to a blend.[20] The operator went to the lab for further instruction.[21] The lab technician on duty instructed him to finish adding the component and then shut down the blend until the next morning so a chemist could determine if a correction could be made.[22] Murray overrode the lab technician and ordered the operator to finish the blend.[23] Since the finished blend was not correctable, Shell lost

---

[16]Brook Aff. 3:60–4:75.

[17]*Id.*

[18]Brook Aff. 4:76–79

[19]*Id.*

[20]Dkt. 18-8.

[21]*Id.*

[22]*Id.*

[23]*Id.* In contrast to the account cited in the disciplinary memorandum, Murray recounts he was unaware that the blend was damaged because the control room operator did not notice or report the mechanical failure. Murray Aff. 4:77–5:89. (Dkt. 22-1). Murray further asserts that the lab technician lied to Warner when she told him she instructed Murray to stop the blend. *Id.* Murray explained his side of the story to Warner, but Warner took the lab technician's word over his, allegedly because of his race. *Id.*

"significant dollars."[24] In response to this incident, on December 8, 2006 Warner issued Murray a "written reminder," documenting Murray's failure to follow blending procedures.[25]

Brook's Performance Improvement Plan

On July 27, 2007, Brook met with Warner and Plant Manager Eli Finister.[26] There, Warner and Finister issued Brook a "performance improvement plan" (PIP), noting his failure to adhere to blending policies in September 2006, his poor decision making, his failure to apply positive discipline, and his failure to demonstrate leadership skills.[27] Brook denies these deficiencies.

The PIP also mentions an instance where Warner instructed Brook to confer with Tim Melton to record tank gauges, which required shutting down the blending process.[28] Contrary to Warner's instructions, the PIP notes that the blending process was not shut down.[29] When asked why he disobeyed Warner's instructions, Brook explained that Lisa (a clerk) told him to continue the blend.[30] When Warner followed up with Lisa, Lisa denied telling Brook to continue the blend.[31] Brook's affidavit asserts that Lisa lied to Warner, and that he actually did shut down the blending process to record tank gauges.[32]

---

[24]Dkt. 18-8.

[25]*Id.*

[26]Brook Dep. 54:24–55:15; Dkt. 18-4.

[27]Dkt. 18-4.

[28]*Id.*

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]Brook Aff. 7:143–47.

The PIP next notes that Brook lacked a commitment to take responsibility for his shift.[33] In this regard, Brook asserts that Warner would inquire as to specific production results, with the data in his (Warner's) hands.[34] Warner would not let Brook look at the data to answer his questions, which made Brook appear apathetic.[35]

The PIP also noted that Brook submitted erroneous gauge sheets.[36] Brook responds that gauge sheets contain hundreds of pieces of information, and it is impossible for any blend supervisor to verify all of the information.[37] Brook alleges that he "reviewed the gauge sheets as thoroughly as any other supervisor," and notes that Guidry was not disciplined for failure to verify all information on gauge sheets.[38]

The PIP notes Warner asked Brook to rectify a messy transfer sheet.[39] According to the PIP, Brook responded by saying that he coached his operator.[40] Instead of clarifying the transfer sheet, an inventory analyst and another supervisor had to do so.[41] Brook's affidavit claims that instead of

---

[33]Dkt. 18-4.

[34]Brook Aff. 7:148–54.

[35]*Id.*

[36]Dkt. 18-4.

[37]Brook Aff. 8:157–63.

[38]*Id.*

[39]Dkt. 18-4.

[40]*Id.*

[41]*Id.*

clarifying the sheet, Warner wanted Brook to "artificially get the numbers to match," and Brook did not know how to respond to such an unethical instruction.[42]

After issuing the PIP, Warner offered Brook the option to pursue other opportunities within Shell.[43] Brook bid on other openings at Shell, but did not obtain another job.[44]

Murray's Performance Improvement Plan

Warner also issued Murray a PIP on July 26, 2007.[45] Murray disputes many of the allegations made in this disciplinary memorandum.

First, the PIP asserts that Murray has poor communication skills.[46] Murray's affidavit denied this, and asserts he has excellent communication with the lab, co-employees, and inside clients.[47] The affidavit of another operator also controverts this statement.[48]

The PIP also noted that Murray put a defective tank into service.[49] However, Murray's affidavit states he originally informed Warner that the tank needed to be fixed on July 3, 2007, and it was Don Kleppelid, another blending supervisor, who put the tank back into service on July 19.[50] After Kleppelid decided to start using the tank, Murray called Warner to discuss the issue, to which

---

[42]Brook Aff. 8:164–67.

[43]Brook Dep. 56:1–7; Dkt. 18-4.

[44]Brook Dep. 56:8–25.

[45]Dkt. 18-9.

[46]*Id.*

[47]Murray Aff. 5:94–100.

[48]Marksberry Aff. 4:73-74. (Dkt. 22-11).

[49]Dkt. 18-9.

[50]Murray Aff. 5:101–6:126.

Warner requested him to schedule a meeting via email.[51] Murray subsequently sent the email on July 26, but Warner never responded.[52]

The PIP next noted that Murray failed to complete the required blends for his shift.[53] However, Murray has produced records showing that generally only two blends were required for each shift, and that the instance the PIP likely referred to involved four assigned blends for three operators—an unusually large order that required extra time to complete.[54] Murray asserts that he requested Warner to review these records, but Warner refused.[55] In addition, Murray points to his and Brook's "right first time" percentages (RFT), both of which were above average; in contrast Guidry's RFT was below average.[56] Murray asserts that Warner refused to meet with him regarding meeting production requirements.[57]

The PIP also noted Murray signed erroneous gauge sheets.[58] Like Brook, Murray's affidavit argues that gauge sheets contain too much information to verify,[59] and that he was confirming as

---

[51]*Id.*

[52]*Id.*

[53]Dkt. 18-9.

[54]Murray Aff. 6:127–7:145.

[55]*Id.*

[56]Murray Aff. 7:146–8:165.

[57]*Id.*

[58]Dkt. 18-9.

[59]Murray Aff. 8:166–73.

much information as other blend supervisors.[60] He also notes that Guidry was not disciplined for his failure to verify gauge sheet information.[61]

Finally, the PIP noted Murray's errors in making erroneous SAP entries.[62] However, Murray's affidavit states that he and Brook had the least number of errors, and Guidry had the most.[63] Guidry was never disciplined for his SAP entry errors.[64]

The "Burnt Additive Incident" and Decision Making Leaves

In October 2007, an incident occurred where steam coils overheated a blend and burned it, ruining the blend.[65] Despite Brook's daily monitoring of tank temperatures, Brook and his lead operator did not notice the tank was overheating.[66]

On December 17, 2007, in response to this "burnt additive incident," Brook and Murray were each issued a "decision making leave" (DML) as the next disciplinary step after the written reminder and PIP.[67] Brook's DML cited his general failure to monitor and document tank temperatures in the blend log.[68] Murray's DML stated that his documentation of tank temperatures was generally

---

[60]Murray Aff. 9:178–86.

[61]*Id.*

[62]Dkt. 18-9.

[63]Murray Aff. 9:174–77.

[64]*Id.*

[65]Brook Dep. 73:7–17.

[66]Brook Dep. 74:20–75:8.

[67]Brook Dep. 75:14–18; Dkt. 18-5.

[68]Dkt. 18-5.

inadequate.[69] Moreover, Brook and Murray's DMLs pointed to their failure to monitor or document temperatures of the tank involved in the incident.[70]

All other blending supervisors were disciplined except for Guidry, the only African American blending supervisor.[71] Affidavits of other operators point out that no operator or blend supervisor adequately kept blend logs, yet all blend supervisors and operators were disciplined except the African American ones.[72]

The summary judgment evidence suggests that Guidry was not disciplined because he was on leave at the time of the incident.[73] However, Murray was also on a seven-day leave at the time, and he was disciplined.[74]

Brook and Murray's Removal

On April 10, 2008, Finister and Warner met with Brook to discuss his performance.[75] After reviewing his performance history, Finister told Brook that since he was no longer qualified, he was going to be removed from his supervisor position at HLP, and he would have an office at one of Shell's buildings downtown for four months to bid on other openings within Shell.[76] If Brook did

---

[69]Dkt. 18-10.

[70]Dkt. 18-5; Dkt. 18-10.

[71]Dkt. 18-7; Brook Dep. 76:24–77:18, 79:24–80:9. Vences Aff. 2:27–30. (Dkt. 22-15).

[72]Marksberry Aff. 3:54–57. Rodriguez Aff. 2:54–3:59. (Dkt. 22-14). *See* Vences Aff. 2:27–32.

[73]Brook Dep. 77:19–21, 79:2–7, 79:24–80:9.

[74]Murray Aff. 3:42–46; Marksberry Aff. 3:44–45.

[75]Brook Dep. 85:9–86:20.

[76]*Id.*

not find a job after four months, he would be terminated.[77] Five days later, Murray had a similar meeting removing him from his position  and giving him four months to find another position with Shell.[78]

Brook obtained four interviews, but did not obtain any of those positions.[79] Murray did not bid for any positions,[80] but found a job outside Shell in June.[81]

Brook was ultimately terminated on August 15, 2008. Brook was replaced by Mark Bunting (a Caucasian man).[82] Murray was initially replaced by an African American man from a plant in Vicksburg, Mississippi.[83] This employee eventually transferred back to Mississippi and was replaced by Scott Smerek (Caucasian).[84]

### Warner's Behavior

In addition to the allegedly discriminatory discipline leading to termination, plaintiffs assert Warner treated non-African Americans unfavorably.[85] In his affidavit Murray testified, "Warner treated non-blacks in a very cold and distant fashion . . . [and] would not even allow some non-blacks to hand him various documents, but would require some non-blacks to use a black middleman

---

[77]*Id.*

[78]Murray Dep. 111:22–112:5, 118:21–119:6.

[79]Brook Dep. 87:19–21, 89:19–92:4, 94:9–13.

[80]Murray Dep. 120:15–18.

[81]Murray Dep. 121:24–122:9.

[82]Brook Dep. 97:20–98:3.

[83]Brook Dep. 95:14–21; Murray Aff. 2:17–18; Brook Aff. 10:216–17; Marksberry Aff. 1:14–19; Rodriguez Aff. 1:26–30; Vences Aff. 2:22–23.

[84]Brook Dep. 97:9–98:3; Marksberry Aff. 1:14–2:19.

[85]*See* Marksberry Aff. 2:26–37; Rodriguez Aff. 3:61–64.

to deliver him a document."[86] He ignored non-African Americans, including Brook and Murray.[87] When he did not ignore non-African Americans, he spoke to them "in an insulting and condescending manner."[88] Warner was friendly to Guidry and was never seen scolding him like he would to Brook and Murray.[89]

Regarding work-related matters, Warner examined Murray and Brook's work closer than Guidry's.[90] According to operator John Marksberry, Brook, Murray and Guidry all made the same errors; however only Brook and Murray were disciplined.[91]

***Brook's FMLA Leave Request***

In the beginning of August 2008, Brook applied for FMLA leave to have a spinal discectomy performed.[92] The surgery was performed on August 6, 2008.[93] Brook was never granted such leave, and as stated above, was ultimately terminated on August 15, 2008.

---

[86]Murray Aff. 10:208–11; *see* Rodriguez Aff. 2:44–46.

[87]Murray Dep. 117:12–15; Brook Aff. 9:187–89; Vences Aff. 2:39–3:42.

[88]Marksberry Aff. 4:63–64; Rodriguez Aff. 2:48–50. Murray specifically recounts Warner either scolding him or ignoring him whenever the two met. Murray Aff. 11:235–36. Murray also took Warner's statement "Anybody (like you) that own[s] horses must be stupid." to be insulting. Murray Aff. 2:236–38. Murray asserts unjustified criticism from Warner on a monthly basis. Murray Aff. 2:238–40.

[89]Marksberry Aff. 4:63–64, 5:88–89.

[90]Vences Aff. 3:42–43.

[91]Marksberry Aff. 2:38–3:43.

[92]Brook Dep. 98:4–19, 99:14–18.

[93]Brook Dep. 101:10–12.

*Procedural History*

From these facts, Brook and Murray each filed a charge with the Equal Employment Opportunity Commission (EEOC) on December 29, 2008 and January 26, 2009 respectively.[94] The EEOC issued plaintiffs each a separate "dismissal and notice of rights" letter on April 30, 2009.[95] On July 30, 2009 plaintiffs filed suit against Shell.[96] Their first amended complaint alleges unlawful discrimination under Title VII, the TCHRA and 42 U.S.C. § 1981—specifically for plaintiffs' termination, discipline, and for harassment.[97] Brook also asserts an FMLA claim.[98] On August 31, 2010, Shell filed the instant motion for summary judgment,[99] and plaintiffs responded on November 22, 2010.[100] Shell replied on December 17, 2010.[101]

## Analysis

### 1.    Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and therefore judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(c). A dispute is "genuine" if the evidence could lead a reasonable jury to find for the non-movant. *In re*

---

[94]Dkt. 18-11; 18-12; 26.

[95]Dkt. 18-13; 18-14; 26.

[96]Dkt. 1.

[97]Dkt. 15.

[98]*Id.*

[99]Dkt. 18.

[100]Dkt. 22.

[101]Dkt. 27.

*Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002). The movant has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). If the movant satisfies its burden, "the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial." *Douglass*, 79 F.3d at 1429.

## 2.   Evidentiary Objections[102]

### a.   Plaintiffs' Objections: Support for Factual Assertions

Plaintiffs' response argues that various factual assertions in Shell's motion are evidence that should be stricken as unsupported by summary judgment evidence. Unsupported factual assertions in pleadings are not summary judgment evidence, and cannot be relied on in deciding issues raised by a motion for summary judgment. *See Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994); *see also Refrigeracion Y Restaurante S.A. de C.V. v. Wal-Mart Stores, Inc.*, 189 F.3d 469, 1999 WL 548666, at *2 (5th Cir. July 13, 1999). The majority of plaintiffs' objections are overruled because the factual assertions are actually supported by the summary judgment evidence cited.[103] Three of the objections are overruled because Shell's motion merely mis-cited its exhibits and the

---

[102]In addition to the evidentiary objections discussed below, plaintiffs' response argued that defendant's exhibits 11–16 (charges of discrimination, right-to-sue letters, and deposition excerpts) were inadmissible as unauthenticated. Since plaintiffs' exhibits containing deposition excerpts were also unauthenticated, this court ordered the parties to correct these deficiencies. *See* Dkt. 24.

[103]These include objections to the assertions that (1) Brook did not have authority to continue a blend after his operators used the wrong ingredient; (2) a DML is the final step in Shell's progressive discipline; (3) burnt additives may release poisonous gasses; (4) Guidry was on medical leave at the time of the "burnt additive incident"; (5) plaintiffs were ultimately replaced by Caucasian supervisors; and (6) the blending department was below the expected RFT rating.

factual assertions are supported by summary judgment evidence in the record elsewhere.[104] Finally, plaintiffs object to Shell's assertions that (1) plaintiffs conceded the workplace was professional at all times, and that (2) plaintiffs struggled to identify evidence of racial animus. These assertions are not supported by summary judgment evidence (although they have no bearing on the outcome of the instant motion), and plaintiffs' objections are sustained.

> **b.     Plaintiffs' Objections: Hearsay**

Plaintiffs argue that Shell's assertion that Guidry was on medical leave during the "burnt additive incident" is hearsay. Moreover, plaintiffs argue that Brook's statement in his deposition that he was replaced by a white supervisor is hearsay. Neither statement properly falls within the definition of hearsay.

As a general rule (riddled with exceptions), hearsay is inadmissible. Fed. R. Evid. 802. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Neither of the assertions in issue attempt to admit a statement made by a person other than the declarant. First, Shell's assertion in its motion that Guidry was absent during an incident does not contain a statement made by a person other than Shell. Second, Brook's assertion that he was replaced by a Caucasian supervisor does not contain a statement by someone other than Brook. Plaintiffs' objections are overruled.

---

[104]These include objections to the assertions that (1) a certain blend cost Shell $100,000; (2) Brook did not obtain any positions he applied for during the last four months of his employment with Shell; and (3) the blending department was not meeting expectations and that a change was needed.

c.       **Shell's Objections**

In its reply brief, Shell objects to statements in John Markberry, Andy Vences, and plaintiffs' affidavits, as unsubstantiated, conclusory, made without personal knowledge, and without foundation. The court need not rule on these objections. To the extent summary judgment is denied on plaintiffs' claims, the analysis does not rely on the evidence objected to.

3.       **Plaintiffs' claims of discriminatory discipline under Title VII and the Texas Commission on Human Rights Act (TCHRA) are barred as untimely.**

In Texas, Title VII plaintiffs have 300 days "after the alleged unlawful employment practice occurred" to file a charge with the Equal Employment Opportunity Commission. 42 U.S.C. § 2000e-5(e)(1). Under the TCHRA, plaintiffs have 180 days. Tex. Labor Code § 21.202. In construing the term "unlawful employment practice," the Supreme Court has distinguished claims based on discrete discriminatory acts from hostile work environment claims. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002). The former occurs "on the day that it 'happened.'" *Id.*; *see Bartosh v. Sam Houston State Univ.*, 259 S.W.3d 317, 321 (Tex. App.—Texarkana 2008, pet. denied) (citing *Morgan*, 526 U.S. at 110).  Here, plaintiffs filed their charges of discrimination on December 29, 2008 and January 26, 2009. The latest disciplinary step—plaintiffs' DMLs—occurred on December 17, 2007, well outside the 300 and 180 day limits. Thus, plaintiffs' discriminatory discipline allegations, considered as stand-alone claims under Title VII and the TCHRA, are time-barred absent a countervailing doctrine.

Plaintiffs argue that their discipline claims should be considered timely under the continuing violation doctrine. In Title VII cases, a discrimination claim based on numerous acts is timely, even if some of the acts fall outside of the requisite time period, if at least one of the acts falls within that time period and together the acts constitute one "unlawful employment practice." *Morgan*, 536 U.S.

at 116–17. Discrete discriminatory acts like disciplinary measures, however, are each considered their own unlawful employment practice. *See Morgan*, 536 U.S. at 111 ("There is simply no indication that the term 'practice' converts related discrete acts into a single unlawful practice for the purposes of timely filing."); *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th Cir. 2001) ("a one-time employment event, including failure to hire, promote, or train and dismissal or demotions, is 'the sort of discrete and salient event that should put the employee on notice that a cause of action has accrued.'" (quoting *Hickabay v. Moore*, 142 F.3d 233, 240 (5th Cir. 1998))). Thus, the continuing violation doctrine cannot save the discipline claims under Title VII jurisprudence.

Likewise under Texas law, to show a continuing violation "a plaintiff must show an organized scheme leading to and including a present violation, so that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action." *Davis v. Autonation USA Corp.*, 226 S.W.3d 487, 493 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Cooper-Day v. RME Petroleum Co.*, 121 S.W.3d 78, 87 (Tex. App.—Fort Worth 2003, pet. denied); *Huckabay v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998)). *See Santi v. Univ. of Tex. Health Science Center at Houston*, 312 S.W.3d 800, 805 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("a claim of a hostile work environment is a continuing violation, while 'termination, failure to promote, denial of transfer, or refusal to hire' are discrete acts"); *Anderson v. Limestone Cty*, No.10-07-00174-CV, 2008 WL 2629664, at *4 (Tex. App.—Waco July 2, 2008, pet. denied) (continuing violation doctrine did not apply to a discriminatory reprimand claim). Here, plaintiffs allege that the discriminatory discipline imposed was part of a scheme by Warner leading to Brook and Murray's ultimate termination. Their theory however, ignores the requirement that "the

17

cumulative effect of the discriminatory practice," and not discrete occurrences or acts, must give rise to an action under the TCHRA. Plaintiffs' complaint clearly raises a disparate treatment claim based on alleged discriminatory discipline. Thus, the doctrine does not apply under Texas jurisprudence.

Since the continuing violation does not extend the scope of liability to cover plaintiff's discipline claims under Title VII or the TCHRA, Shell is entitled to summary judgment on those claims. Of course, this ruling does not preclude evidentiary consideration of those events as they may be relevant to the termination claims, which are the subject of a timely charge. *See Morgan*, 536 U.S. at 113 (prior acts outside the 300 day time period may be used as background evidence in support of a timely claim).

### 4.   A genuine issue of material fact exists as to plaintiffs' discriminatory termination claims.[105]

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). "Although intermediate evidentiary burdens shift back and forth . . . '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Shell first argues that plaintiffs cannot establish a prima facie case of discrimination because they were replaced by Caucasian supervisors. Although replacement by a person outside the

---

[105]Plaintiffs bring discrimination claims under Title VII, the TCHRA and 42 U.S.C. § 1981. Since "these three statutory bases are functionally identical," the remaining discrimination claims will only be discussed under Title VII jurisprudence. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999).

plaintiff's protected class is often listed as an element of liability,[106] the Fifth Circuit has held that this fact, although material, is not outcome determinative. *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000); *Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 n.7 (5th Cir. 1997). Here, the summary judgment evidence presents a fact issue as to whether or not Murray was initially replaced by an African American supervisor.[107] And even though Brook was replaced by a Caucasian supervisor, the evidence creating a fact issue as to pretext also raises a fact issue as to Warner's discriminatory intent here.

Plaintiffs have presented sufficient evidence to create a fact issue as to whether Shell's proffered legitimate non-discriminatory reasons—the progressive disciplinary steps—were pretextual, and whether Shell acted with unlawful discriminatory intent in terminating plaintiffs. First, there is evidence that Warner did not uniformly hold blend supervisors responsible for their operators' errors. Brook was issued a "written reminder" after his operator used the wrong ingredient and he corrected it without authority.[108] However, when Guidry's operator reversed two primary element ratios, requiring a 30,000 gallon correction, Guidry was not disciplined.[109]

Second, Brook and Murray's PIPs are sufficiently rebuffed by plaintiffs' summary judgment evidence to raise a fact issue as to their validity and Shell's motivation behind plaintiffs' ultimate termination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (rejection of an employer's proffered legitimate nondiscriminatory reason allows an inference of intentional

---

[106]*See, e.g.*, *Shackelford*, 190 F.3d at 404.

[107]Brook Dep. 95:14–21; Murray Aff. 2:17–18; Brook Aff. 10:216–17; Marksberry Aff. 1:14–19; Rodriguez Aff. 1:26–30; Vences Aff. 2:22–23.

[108]Dkt. 18-3.

[109]Brook Aff. 3:60–4:75.

discrimination). Here, the summary judgment evidence detailed above—which need not be repeated here—controverts Warner's reasons for the PIP. Thus plaintiffs have presented sufficient evidence to raise a fact issue as to whether plaintiffs' terminations were the product of unlawful racial animus.

Third, the discipline imposed by Warner after the "burnt additive incident" raises a fact issue as to whether Brook and Murray's DML—and in turn, their termination—was racially motivated. After the "burnt additive incident," Brook and Murray were disciplined for inadequately monitoring and documenting tank temperatures.[110] Guidry was also guilty of not recording tank temperatures, but he was not disciplined.[111] In addition, Murray was disciplined even though both Murray and Guidry were absent during the incident.[112]

Finally, both Brook and Murray recall that the reason they were removed from their positions was that they were no longer qualified.[113] Guidry was not removed form his position. However, plaintiffs' summary judgment evidence shows that their RFT ratings were above average, whereas Guidry's was below average.[114]

The summary judgment record raises a fact issue on the ultimate question of whether plaintiffs were terminated because of their race. Shell's motion is denied with respect to plaintiffs' claims for discriminatory termination.

---

[110]Dkt. 18-5, Dkt. 18-10.

[111]Brook Dep. 76:24–77:18, 79:24–80:9; Marksberry Aff. 3:54–57; Rodriguez Aff. 2:54–3:59.

[112]Brook Dep. 77:19–21, 79:2–7, 79:24–80:9; Murray Aff. 3:42–46; Marksberry Aff. 3:44–45.

[113]Brook Dep. 85:9–86:20; Murray Dep. 111:22–112:5.

[114]Dkt. 22-7.

5.    **Shell is entitled to summary judgment on plaintiffs' harassment claims, as they are insufficiently severe or pervasive.**

To be actionable, harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Whether harassment is sufficiently severe or pervasive depends on "the totality of the circumstances including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift*, 510 U.S. 17, 23 (1993)); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (characterizing actionable harassment as "extreme"). Only harassment that the plaintiffs experienced is relevant to the severe-or-pervasive determination. *See Septimus v. Univ. of Houston*, 399 F.3d 601, 612 (5th Cir. 2005). Title VII is not a general civility code, and does not convert every workplace argument into a federal case, even when insults are exchanged. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998).

The summary judgment evidence vaguely asserts that Warner often ignored or insulted Brook and Murray.[115] Murray generally asserts he was subjected to unjustified criticism monthly.[116] It's also asserted that Warner required African American intermediaries to accept documents, however neither Brook nor Murray set forth examples of Warner not accepting documents from them.[117] In

---

[115]Murray Dep. 117:12–15; Murray Aff. 11:235–38; Brook Aff. 9:187–89; Marksberry Aff. 4:63–64; Rodriguez Aff. 2:48–50; Vences Aff. 2:39–3:42.

[116]Murray Aff. 11:238–40.

[117]Murray Aff. 10:208–11; *see* Rodriguez Aff. 2:44–46.

21

contrast, Warner was friendly to Guidry.[118] Finally, Brook and Murray generally allege their work was examined more closely than Guidry's.[119] Aside from these generalizations, there is no evidence of specific instances. *See Parker v. State of La. Dep't of Educ. Special Sch. Dist.*, 323 F. App'x 321, 326 (5th Cir. 2009) (noting plaintiff's failure to offer evidence of the specific nature and extent of additional tasks she was required to perform); *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (noting an absence of concrete examples in affirming the district court's grant of employer's motion to dismiss).

The harassment here largely rests on Warner's ignoring or insulting plaintiffs on mostly unspecified occasions. The only concrete example in the evidence is Warner's statement that people (like Murray) who own horses are stupid. Such a comment might be insensitive to horse owners, but it cannot credibly be deemed racially offensive. And because the alleged insults are largely unknown, it's unclear whether they were humiliating or merely offensive. Warner's conduct was not in any case physically threatening. Finally, the conduct at issue is not the type that would unreasonably interfere with a reasonable person's work performance. Taken together, in light of the factors noted above, a reasonable jury could not find the alleged harassment sufficiently severe or pervasive to be actionable. Thus, Shell is entitled to summary judgment as to plaintiffs' harassment claims.

6.    **FMLA Claims**

   a.    **Shell is not entitled to summary judgment on Brook's interference claim.**

As outlined above, after Brook was placed on paid leave to search for other positions within Shell, he applied for FMLA leave to have back surgery. There is no evidence of any response from

---

[118]Marksberry Aff. 4:63–64, 5:88–89.

[119]Vences Aff. 3:42–43.

Shell, and Brook was terminated at the end of his paid leave. From these facts, Brook's amended complaint alleges that Shell interfered with his FMLA rights to medical leave.

Although the Fifth Circuit is silent on this issue, other circuit courts that have addressed it have concluded that an employee's right to commence FMLA leave is not absolute. If the plaintiff would have been terminated regardless of his request for leave, his interference claim cannot prevail. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010); *Phillips v. Mathews*, 547 F.3d 905, 911–12 (8th Cir. 2008); *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 877–78 (10th Cir. 2004); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). *See Lochridge v. City of Winston-Salem*, 388 F. Supp. 2d 618 (M.D.N.C. 2005) (employer was not required to discontinue termination proceedings after employee's FMLA request). "[A]n employee who requests FMLA leave has no greater protection against her employment being terminated for reasons unrelated to an FMLA request than she did before submitting the request." *Krutzig*, 602 F.3d at 1236.

Here, Shell placed Brook on paid leave in April 2008—five months before Brook requested FMLA leave. Since Brook would have been terminated in August pursuant to the terms of his paid leave, regardless of his FMLA request, his interference claim must fail. Shell is entitled to summary judgment on this claim.

### b.      Shell is entitled to summary judgment on Brook's statutory notice claim.

Brook's response to Shell's summary judgment motion alleges that Shell did not provide Brook notice of his eligibility for leave under 29 C.F.R. § 825.300(d). This claim was not raised (or even hinted to) in Brook's amended complaint. It is well settled that "[a] claim which is not raised in the complaint, but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th

Cir. 2005) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)). Since this claim was raised for the first time in Brook's response brief, it is not properly raised. Shell is entitled to summary judgment on this claim.

## Conclusion

For the foregoing reasons, Shell's summary judgment motion is granted in part and denied in part. Shell motion is granted with respect to (1) plaintiffs' discriminatory discipline claims under Title VII and the TCHRA; (2) plaintiffs' harassment claims; and (3) Brook's FMLA claims. Shell's motion is denied as to all other claims.

Signed at Houston, Texas on January 3, 2011.

Stephen Wm Smith
United States Magistrate Judge